## 367. SOLOMON *v.* THE STATE.

1. Taken in connection with the charge on the same subject, it is not error to state, in ruling upon the admissibility of testimony relative to dying declarations, that "the rule is this, the meaning of the law is this: that when a man feels like he is in a dying condition and makes a statement, it has the same weight as if made under oath; upon the theory that a man in a dying condition would not misrepresent a fact."

2. Under the evidence submitted, the law of voluntary manslaughter should have been given in charge to the jury, and the jury were properly instructed upon that subject by the trial judge. "Minor verbal inaccuracies in the charge, not calculated to mislead the jury, do not constrain the grant of a new trial." *Moody* v. *State,* 1 *Ga. App.* 772, 58 S. E. 262.

3. The ground of the motion for a new trial, predicated upon alleged newly-discovered evidence, presents no reason for setting aside the verdict, and does not commend itself to favorable consideration. When the affidavits filed in connection with this ground are considered, no reason is afforded for believing that on another trial a different result would or should be obtained.

4. The numerous grounds of the motion for new trial not specifically treated by the rulings above announced disclose no reason for reversing the judgment refusing a new trial.

Conviction of manslaughter, from Pulaski superior court—Judge Parker. December 29, 1906.

Argued March 21,—Decided May 24, 1907.

*A. C. Pate, Marion Turner, Shelby Myrick,* for plaintiff in error.

*E. D. Graham, solicitor-general,* contra.

RUSSELL, J. Mark Solomon was indicted for the offense of murder, and was convicted of the offense of manslaughter. After conviction a motion for new trial was made and was overruled; and the bill of exceptions assigns error upon the judgment refusing a new trial. As appears from the record, the defendant and one Oscar Newman had an altercation on the night of November 15, 1885, in which Newman was cut in the side; and Newman died

three days later from the effects of the wound.  They were re-
turning home along the road after having called on some young
girls.   Newman was about eighteen years of age, Solomon perhaps
a little younger.   A dispute arose about an apple which Solomon
or Newman had given to one of the young ladies that evening,
both of them having given an apple to the same young girl.   Four
of the young men were going along the road together,—Newman,
Solomon, Henry Dixon, and J. T. Grimsley.   Grimsley had given
an apple to Newman, and he asked Newman what he did with the
apple he gave him.   Newman replied, "I gave it to my girl."
The defendant remarked that a respectable girl would not take an
apple from a young man.   Newman then said, "Yes, I've given her
baskets full."   Solomon again said that no respectable young lady
would take an apple from a young man.   Newman said, "My sis-
ters are respectable."   Then Solomon said, "You must be a dam
fool," and Newman struck Solomon across the shoulders with a
walking-cane.   As he did so, Solomon made a back-handed lick,
as they were walking side by side.   As soon as the lick was made,
Newman said, "Boys, he has cut me."   They were at the fence
where Newman turned off to go through the field.   Dixon and
Grimsley went with Newman through the field.   The defendant
went on home.   Newman had gone only a little way in the field
before he had to lie down.   Help was summoned from his home,
and he was carried there.   Newman said, "He has cut me."   Sol-
omon picked up a limb lying in the road and drew it back and
said, "If you haven't enough, I'll give you enough."   The cane
with which Newman struck Solomon was a little limber cane about
the size of a finger.   It was not a stick that one could kill another
with.   Newman lived three days and three nights.

According to the witness Grimsley, Dixon and himself were walk-
ing together, and the defendant and the deceased were also walking
together; but the evidence does not disclose which couple was
ahead of the other.   The first thing that attracted Grimsley's atten-
tion was that Solomon called Newman a "damn fool," and all
stopped.   The next thing that occurred was that Newman struck
Solomon with the little walking-cane, and the next was a back-
handed lick from Solomon, and Newman's exclamation that he
was cut.   Grimsley did not see any knife.   It was at night, and,
though the moon was shining, it was cloudy.   The State proved

the dying statement of the deceased, by Jesse Newman, his father. This statement was as follows: "You heard me and Dixon as we were going down to Mrs. Jesup's. You heard me shaking the apples off the trees. I gave one to one of the girls. On the return back home Mr. Solomon got in a dispute about it. He ran under me and cut me. As he cut me I struck him with that little cane." The wound was in the abdomen of the deceased, about opposite the navel and about two inches long, ranging downwards. It did not go straight in. This is the case on the part of the State. The defendant's statement was, that the deceased struck him with a stick, and that he then reached down and took up a limb and drew it back at the defendant, who was approaching him with his knife drawn, having pulled it from his left-hand pocket; and that he, Solomon, hit Newman over the head with the limb, and Newman ducked down, and as he went down he said, "I am cut;" and then Newman got up, shut his knife up, and put it in his pocket. Solomon's contention about the knife was that if Newman was cut he cut himself.

The defendant was indicted shortly after the killing, but for some reason, not disclosed by the record, he was not tried for more than twenty-one years. He moved for a new trial, upon various grounds. In the first assignment of error it is insisted that the judge erred in saying, in the presence of the jury, while ruling upon the admissibility of certain testimony relative to the dying declaration of Oscar Newman, "The rule is this, the meaning of the law is this: that when a man feels like he is in a dying condition and makes a statement, it has the same weight as if made under oath; upon the theory that a man in a dying condition would not misrepresent a fact." It is insisted, that this language contained an erroneous statement of the law as to the weight and effect of a dying declaration, and was calculated to impress the jury that the deceased would not misrepresent the facts of the difficulty which occurred between him and defendant; and that the statement of the court amounted to an expression of opinion, in the presence of the jury, upon the evidence. We do not think that the assignment of error is well taken. The court correctly stated the reason underlying the admissibility of dying declarations. There was no expression or intimation of opinion as to what weight the jury should give the evidence, in saying that such state

ments are admitted "upon the theory that a man in a dying condi-
tion would not misrepresent a fact."

The second assignment of error complains that the court charged
the law of voluntary manslaughter, and read to the jury, as a part
of the charge on that subject, section 65 of the Penal Code. The
plaintiff in error insists that the court, by reading the entire sec-
tion, gave the jury the impression that voluntary and involuntary
manslaughter were one and the same thing, and could have pre-
vented the jury from bringing in a verdict of involuntary man-
slaughter; and the plaintiff in error insists further that the judge
should not have charged upon the subject of voluntary manslaugh-
ter at all. This assignment is absolutely without merit. All the
evidence in the case shows a sudden quarrel; and not to have
charged upon the subject of voluntary manslaughter would have
been manifest error. It would have been more proper to omit the
definition of involuntary manslaughter, contained in section 65;
as no view of the case rendered a charge upon involuntary man-
slaughter applicable; but the error, if any, was certainly harmless.

There is no merit in the third ground, in which exception is
taken to the charge of the court. The portions of the charge ex-
cepted to in the fourth, fifth, and sixth grounds of the amended
motion are correct presentations of principles of law applicable to
the facts of the case. The charge excepted to in the fourth ground
was as follows: "If they (the facts and circumstances surround-
ing the case) were such as to excite the fears of a reasonable man
that some bodily harm, less than a felony, was imminent, and the
defendant killed the deceased under these circumstances, he would
be guilty of voluntary manslaughter." The fifth ground complains
of the following charge: "I charge you further, that if you find
that the difficulty between the defendant and the deceased was
brought about by the defendant cursing the deceased, that the de-
ceased thereupon struck him with a stick—a small stick,—that
the stick did not make a sufficient blow to be disproportionate to
the insult given, and that thereupon the defendant stabbed and
killed the deceased, he would be guilty of murder." The charge
complained of in the sixth ground was given in connection with
instructions upon the application of the rule of reasonable doubt,
and, considered in connection with the rest of the charge, was
beneficial, rather than hurtful, to the defendant. The language

complained of was as follows: "If you are not satisfied of his guilt of the crime of murder, then consider, under the rules of law which I have given you in charge, as applied to the evidence, whether the defendant is guilty of voluntary manslaughter; and if you are satisfied that he is, then it would be your duty to so find. The punishment for voluntary manslaughter is confinement in the penitentiary for not less than one, nor more than twenty years. If you should not be satisfied to a moral and reasonable certainty, and beyond a reasonable doubt, that the defendant is guilty of the offense of murder, then you look to the law as given you in charge, and the testimony as you have heard it from the witness stand in the case, and see whether or not the defendant is guilty of the lesser offense of voluntary manslaughter; and if you find, to a moral and reasonable certainty and beyond a reasonable doubt, that he is, then the form of the verdict would be, 'We, the jury, find the defendant guilty of voluntary manslaughter.'" The error assigned as to these extracts from the charge was that a charge upon the subject of voluntary manslaughter was not warranted by the evidence; and, as we have stated above, a consideration of the evidence satisfies us that there is no merit in these exceptions.

The seventh ground of exception is because the court charged the jury, "If you are satisfied of the guilt of either of these offenses, then the form of your verdict would be, 'We, the jury, find the defendant guilty.'" Not to have instructed the jury as above quoted would have been error, and consequently there is no merit in the assignment of error.

The eighth ground of the motion relied upon the newly-discovered evidence of R. S. Manning, as appears in two affidavits, both dated November 6, 1905, which are as follows: "Personally appeared before me, the undersigned, an officer of the said State, authorized by law to administer oaths, R. S. Manning, who, on oath, says, that he knew Oscar Newman before he died, and was at Oscar Newman's home on Monday or Tuesday before the Wednesday on which Oscar Newman died; that at that time Oscar Newman told deponent that he, Oscar Newman, did not know whether Mark Solomon cut him or whether he cut himself, as his knife was open in his pants pocket at the time of the difficulty with Solomon." The second affidavit was as follows: "Personally appeared before

me, the undersigned, an officer of said State, authorized by law to administer oaths, R. S. Manning, who, on oath, says, that he knew Oscar Newman before Oscar Newman died, and was at his home Monday or Tuesday before he died on Wednesday. That the deponent examined Oscar Newman's clothes, to see where the knife which caused the wound from which Newman died cut the clothes. Deponent says, that there was a hole through the inside lining of Newman's pants pocket, which was directly over or covered the wound in his, Newman's stomach which caused his death; that there was no cut or hole in the outside cloth of the pants; that the pants showed no other cut except the one in the lining of the pocket; that the pants were the ones that Newman wore on Sunday, and were comparatively new." Waiving the point that Judge A. C. Pate, one of defendant's counsel, as appears from the record, did not make the required affidavit, and that his partner could not swear that Judge Pate did not know of the facts therein contained, and for that reason the affidavits would not be admissible as evidence, we think that the ruling of the court was correct, in refusing to grant a new trial because of the newly-discovered evidence. In the first place there was conflict between the testimony of Manning and that presented by the State upon the hearing. Two witnesses swore that Manning was never at the home of Oscar Newman after the cutting, and had no opportunity to have any conversation with him or to see his pants, as he swears he did. This raised a question of veracity and called for an exercise of discretion and choice on the part of the judge of the superior court, with which an appellate court could not interfere and which it would not control, unless that discretion were manifestly abused.

Furthermore, if there had been no contradiction of the affidavit of Manning by other witnesses, the physical facts testified to by all the witnesses, and not contradicted by Manning himself, sustain the judgment of the judge of the superior court in not granting a new trial upon the newly-discovered evidence. All of the witnesses testified with reference to the wound, that it was above the pants line, on the left-hand side of the abdomen, and ranged downward. For Manning's testimony to have any probative value, the wound would have had to range upward, if the hole which was discovered in the pants was caused by the same stroke as caused the death of young Newman. It is strange that, living in the same neighbor-

hood with the parties to this case, Mr. Manning retained this information sacredly locked in his own conscience for twenty-one long years. But even now it could not produce a different result were another trial had; for if it be submitted to a jury that Mr. Manning saw a hole in the pants pocket of the deceased, whether on the right or left-hand side not disclosed, when all the testimony shows that the cut which caused the death of the deceased was above the pants line, on the left-hand side, and ranged downward, it could not affect the case. The affidavit of Manning should, at least, have disclosed whether the pocket was the right-hand or left-hand pocket. His testimony as to the statement made by Oscar Newman comes under the rule that new trials will not be granted for newly-discovered evidence merely impeaching in its character; for Mr. Manning does not claim to have seen the difficulty any more than did Mr. Newman, the father of the deceased. His testimony, therefore, would only be admissible as a contradictory statement, made by the deceased; for the purpose of discrediting the statement made to his father.

We find no error in the judgment overruling the motion for new trial; and being a court for the correction of errors only, we are constrained to affirm the judgment. The judgment must be predicated upon the record, and upon nothing else. But in view of statements made in the argument, the truth of which we admit, we would, could we lawfully do so, award the plaintiff in error a new trial. It seems to us a proper case for the exercise of executive clemency; but we have no pardoning power.

*Judgment affirmed.*